IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 24, 2013

**ROBIN LYNN COOPER v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Knox County**
**No. 96556PC      Steven W. Sword, Judge**

_____

**No. E2013-00693-CCA-R3-PC - Filed November 6, 2013**

_____

A Knox County jury convicted the Petitioner, Robin Lynn Cooper, of one count of attempted second degree murder, one count of rape, one count of aggravated rape, one count of especially aggravated kidnapping, and three counts of aggravated kidnapping. On direct appeal, this Court affirmed the Petitioner's convictions. _State v. Cooper_, No. E2009-00291-CCA-R3-CD, 2010 WL 2490768, at *1 (Tenn. Crim. App., at Knoxville, June 21, 2010), _perm. app. denied_ (Tenn. Oct. 20, 2010). The Petitioner filed a petition for post-conviction relief, asserting that he had received the ineffective assistance of counsel. After a hearing, the post-conviction court dismissed the petition. On appeal, the Petitioner contends that the post-conviction court erred when it dismissed his petition. After a thorough review of the record and applicable law, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Michael Cabage (at hearing) and J. Liddell Kirk (on appeal), Knoxville, Tennessee, for the appellant, Robin Lynn Cooper.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A. Trial**

1

On direct appeal, our Court summarized the underlying facts of the case as follows:

At trial, the victim, Tammy Moody, testified that the [Petitioner] approached her and solicited her for prostitution. The victim testified that she agreed to perform oral sex on the [Petitioner] in exchange for fifty dollars and that the [Petitioner] drove the victim to his home, locking the door from the inside with a key. The victim testified that the [Petitioner's] demeanor changed when she asked for the money and that he told her, "[I]f you want to live, you'll do what I say."

The victim testified that the [Petitioner] took her to a bedroom where a stripped bed was laid on top of a tarp and a pornographic video was playing on the television. The [Petitioner] forced her to remove her clothes and then grabbed her by the throat. The victim testified that she knew she had to "do anything and everything" to stay alive. The [Petitioner] then forced his penis into her mouth and held the victim's head. He forced himself down her throat to the point that she was unable to breathe, causing her to vomit on the [Petitioner].

The victim testified that the [Petitioner] put her on the bed, choked her while he was on top of her, and that she faded in and out of consciousness as a result. She recalled that the [Petitioner] told her, "Robin does what Robin wants to do. Robin wants to kill you, he'll do it." She said that the [Petitioner] also told her that his face was the last face she would ever see. The victim urinated and defecated on the bed. The [Petitioner] rolled her over and penetrated her anus with a large rubber dildo. The victim tried to cry out from the pain, but the [Petitioner] pressed her head into a pillow on the bed. The [Petitioner] then penetrated her anus with his penis and also penetrated her vagina with his penis and the dildo.

She estimated that the ordeal lasted from approximately 6:00 p.m. to 9:00 p.m. when the [Petitioner's] phone rang. The [Petitioner] answered the phone and appeared agitated after the call. He told the victim to sit on the bed and to shut-up. She tried to think of a way out of the situation and told the [Petitioner] to relax. He allowed her to shower but made her keep the bathroom door open. The [Petitioner's] girlfriend, Jennifer Abdelrahman, arrived at the house while the victim was in the shower. The victim thought the girlfriend looked frightened. The girlfriend gave the victim a shirt and some pants. The girlfriend made a phone call on her cellular telephone and distracted the [Petitioner], which allowed the victim to escape.

2

The victim testified that she ran and hid behind an air-conditioning unit next to a large house. She waited there for approximately twenty minutes before running down the street, knocking on doors and attempting to get someone to call the police. The victim flagged down a pizza delivery man who took her near her home and gave her a pizza. The victim did not call the police on the night of the crimes because she wanted to talk to Detective Jeremy Maupin, a police officer she trusted.

When she reached the detective, he told her to go to the hospital. However, the victim said she did not go to the hospital because she did not have insurance. The victim's throat and tongue were swollen after the crimes, and she believed that she had a bone "loose" in her throat. Her ears bled on the day after the incident, and she said that she had bruises for a long time afterward. She also testified that she had blood in her stool for approximately a month after the rape.

Corey Woods testified that he worked for Snappy Tomato Pizza on December 12, 2007, and that he was flagged down by the victim at approximately 11:30 p.m. that night. He stopped for her after he saw her try unsuccessfully to flag down two ambulances. The victim told him, "Thank God you . . . stopped for me. There's a man trying to kill me." Woods said that the victim was not wearing shoes and that he gave her a pizza and took her near the hotel where she said she was staying.

Detective Maupin testified that he had been with the Knoxville Police Department for seven and one-half years. He said that he knew the victim as a prostitute and that she was always honest with him and admitted when she was doing wrong. He received a message from the victim on December 13, 2007, but, because he was on vacation, did not speak to her until he returned to work the following week. He met with the victim, and she acted differently from their usual encounters. She was paranoid and frightened, and her voice sounded raspy and distorted. He testified that the victim's face and throat were bruised. The victim gave him the pants that she wore on the night of the crime, and they appeared to be blood stained.

Investigator Andrew Boatman, of the Knoxville Police Department, testified that he assisted in the interview with the victim. He said that he observed bruising on her neck and recalled that she complained of additional injuries and had difficulty speaking. He said that he participated in the execution of a search warrant at the home of the [Petitioner], where they secured items including a blue comforter, a blue blanket, a roll of duct tape, and a rubber dildo. They also took the bed sheets because a technician

3

took a reading that indicated they might contain bodily fluids. The [Petitioner's] girlfriend was at the residence when the search warrant was executed, and she appeared angry.

Sally Helton, a forensic nursing expert, testified that she performed a "danger assessment" of the victim on January 17, 2008, and determined that the victim had injuries that were consistent with strangulation. She believed it was possible that the victim sustained nerve damage as a result of the attack.

Bernice Phillips testified that she knew the [Petitioner] and his girlfriend and that she had talked to them on the night of December 12, 2007. She said that she received a message from the [Petitioner's] girlfriend, which was played for the court. On the audiotape, the [Petitioner's] girlfriend identified herself, reported that the [Petitioner] had a prostitute at the house, and asked the unidentified person to tell what the [Petitioner] did to her. The unidentified person said, "He choked me. He threatened me. He tried to kill me."

In his defense, the [Petitioner] testified that he met the victim at a gas station, where he propositioned her for sex. He said that he took her to his house because he was leery of the hotel and neighborhood where she was staying. He said that they talked at his house and became comfortable with each other. The [Petitioner] testified that he asked the victim to shower because "some of the girls on Magnolia aren't that clean." He said that the victim performed oral sex on him after the shower.

The [Petitioner] said that the bedroom was being renovated at the time. He said that the victim stopped performing oral sex because it was "taking too long, and she got hungry." He said that he made pancakes for the victim and, after eating, they had sex but were interrupted by his girlfriend. He said this was not the first time that his girlfriend had caught him with another woman. He testified that he did not force the victim to have sex with him and did not strangle her. He claimed that he had the rubber dildo because he was unable to sexually satisfy his girlfriend.

*Cooper*, 2010 WL 2490768, at *1-3.

After hearing the evidence, a Knox County jury convicted the Petitioner of one count of attempted second degree murder, one count of rape, one count of aggravated rape, one count of especially aggravated kidnapping, and three counts of aggravated kidnapping. The trial court merged the kidnapping convictions into one count. The

Petitioner was sentenced to an effective sentence of life without the possibility of parole.

## B. Post-Conviction Hearing

The Petitioner filed a petition for post-conviction relief, contending that his trial counsel was ineffective for: (1) failing to challenge the admissibility of the recorded statement made by the victim on the Petitioner's girlfriend's cell phone; (2) failing to direct the trial court's attention to Tennessee Code Annotated section 40-35-120 when arguing for a continuance; and (3) failing to call Jennifer Abdelrahman, the Petitioner's girlfriend, as a witness on the Petitioner's behalf at trial. The post-conviction court held an evidentiary hearing, wherein it heard the following evidence: Abdelrahman testified that at the time of the offenses, she was living with the Petitioner "as his girlfriend." She testified that, when she came home on the day of the offense, she found the victim, unclothed and uninjured, in bed with the Petitioner. She stated that the victim said she had not had intercourse with the Petitioner. Abdelrahman stated that she believed the victim was "afraid" of the Petitioner but seemed "fine" when she left the residence. Abdelrahman testified that she called the Petitioner's parole officer and told the victim it was the police on the phone and to talk to them.

On cross-examination, Abdelrahman confirmed that she called the Petitioner's parole officer and that she left a voice mail on the officer's phone. Abdelrahman testified that she had called the police in the past when the Petitioner had become violent with her; she also testified that she told the police she was afraid of the Petitioner.

Counsel testified that he represented the Petitioner in general sessions court, which included the preliminary hearing. He testified that he was aware of the sentence the State was seeking for his client and that he requested a continuance before the trial, which was denied.

Counsel testified that he and the Petitioner met with Abdelbrahman on "multiple occasions" and that her "interview and statements to police were contradictory to what she was willing to testify to at trial." Counsel testified that he discussed with the Petitioner whether to call Abdelbrahman as a witness. He said that neither he nor the Petitioner "thought she could keep it together on cross-examination" about the Petitioner's prior conviction and subsequent parole for disemboweling another woman. Counsel testified that it was a "trial tactic" not to call her as a witness because Counsel and the Petitioner both "thought she would come unraveled in moments" on the witness stand.

On cross-examination, Counsel testified that he "left it up to [the Petitioner] to decide if he wanted . . .[Abdelbrahman] to testify." He further stated that he and the Petitioner "agreed that [not putting her on the stand] was the best call."

Counsel also testified that he did not object to the admissibility of the victim's recorded statement because "he thought the recorded statement of the victim . . . would come in as fresh complaint or excited utterance[.]"

Based upon this testimony, the post-conviction court dismissed the petition for post-conviction relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner argues that, because he received ineffective assistance of counsel at trial, the post-conviction court erred when it dismissed his petition for post-conviction relief. The State argues that the post-conviction court properly found that the Petitioner did not prove his allegations by clear and convincing evidence and did not establish that he was prejudiced by any alleged deficiencies in Counsel's representation. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2012). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2012). Upon our review, the trial judge's findings of fact are given the effect and weight of a jury verdict, and this Court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Thus, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial court, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient

performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (internal quotations omitted).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable

7

probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

In its order denying the Petitioner relief on this issue, the post-conviction court made the following findings:

> The Petitioner has failed to carry his burden in establishing that trial counsel's performance was deficient. Furthermore, he has failed to show how he was prejudiced in anyway [sic] by counsel's alleged deficiencies. To the contrary, it appears from the record and the hearing in this matter that [Counsel] provided competent representation to the Petitioner and was successful in having some counts dismissed and others result in lesser convictions. Therefore, the petition for post-conviction relief on the ground of ineffective assistance of counsel is DENIED.

On appeal, the Petitioner maintains that Counsel was ineffective for failing to call Abdelbrahman as a witness and for failing to object to the admissibility of the recorded statement of the victim.

Regarding Counsel's decision not to call Abdelbrahman as a witness, Counsel testified that he discussed with the Petitioner whether to call her as a witness. He testified that he had problems with Abdelrahman as a witness because her statements to the police were inconsistent with what she wanted to say on the witness stand. Counsel testified that, when he attempted to prepare Abdelrahman as a witness, she repeatedly brought up the Petitioner's prior violent conviction and his parole status. Counsel testified that he discussed this with the Petitioner, and they decided together not to call Abdelrahman as a witness at trial.

We review Counsel's conduct from his perspective at the time, *Strickland*, 466 U.S. at 690, *Hellard* 629 S.W.2d at 9, and based on the evidence in the record, we find nothing to suggest that the decision not to call Abdelbrahman was anything but the informed and considered strategic decision of Counsel, made together with his client, after adequate trial preparation. The evidence is that the decision was made by Counsel and the Petitioner after it was determined that Abdelbrahman was not going to be a good witness for the defense and that the Petitioner agreed with this determination and agreed that it would be in his best interest not to call her as a witness. In our view, failing to call Abdelbrahman as a witness under the circumstances is not evidence of "representation . . . below an objective standard of reasonableness." *House*, 44 S.W.3d at 515. Rather, the evidence shows that it was a decision made in the course of trial preparation. Accordingly, the evidence in the record does not preponderate against the post-conviction court's finding. We conclude that the Petitioner failed to show by clear and convincing evidence that Counsel's performance was deficient or that the Petitioner was prejudiced

as a result.

Regarding the Petitioner's second allegation of ineffective assistance of counsel, Counsel's failure to object to the admissibility of the victim's recorded statement, the record supports the post-conviction court's findings. Counsel testified that he presumed that the statement would be admissible under a recognized hearsay exception, the excited utterance exception, and thus he did not object to its admissibility. The Petitioner has provided no evidence that Counsel's decision not to object rendered his representation constitutionally inadequate, and, lacking the same, we will not "second guess" Counsel's tactical and strategical choices. *Cooper v. State*, 849 S.W.2d 744, 747 (Tenn. 1993) (citing *Hellard*, 629 S.W.2d at 9). As such, this Court will not disturb on appeal the post-conviction court's finding that the Petitioner was not deprived of effective assistance of counsel on this issue.

Accordingly, we conclude that the Petitioner failed to show that Counsel's representation fell below an objective standard of reasonableness. *See Baxter*, 523 S.W.2d at 936. The Petitioner has also not proven he was prejudiced by Counsel's representation. The Petitioner is not entitled to relief.

## III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly dismissed the Petitioner's petition for post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE